E. S. PENDLETON, as trustee for the use of J. E. Manix & Company, v. HARRIS-EMERY Co., JACOB S. EMERY, ARTHUR REYNOLDS and M. FRANKEL, Appellant.

**Corporate stock:** AGREEMENT TO WAIVE SPECIAL VALUE. An agreement 1 to waive the benefits to be derived from preferred corporate stock, because issued as preferred, is held, as between the parties to the agreement, to have the effect of depriving the holder of any enhanced value on that account, and to put it on a level with common stock in value.

**Estoppel:** ULTRA VIRES AGREEMENT. When the officers of a corporation 2 tion have treated, as valid, a contract made by its treasurer with a stockholder respecting the character of stock, they cannot thereafter question the validity of the agreement, in an action in their individual capacity.

**Corporate stock:** AGREEMENT AFFECTING ITS VALUE. The owner of 3 corporate stock who has pledged the dividends to another, still has such an interest that he may contract with the corporation, changing its status from that of preferred to common stock.

**Corporate stock:** AGREEMENT AFFECTING VALUE: EVIDENCE. A purchaser 4 chaser of the common stock of a corporation under guaranty limiting the amount thereof, cannot complain of an agreement between the owner of preferred stock and the corporation, that the same shall be considered as common stock, thus increasing the specified limit, after the same has been retired by the corporation. Under the facts in the case such purchaser is held to have been unaffected by the agreement.

**Sale of corporate stock:** BREACH OF GUARANTY: DAMAGES. A vendor 5 of corporate stock sold the same at a stipulated price per share, with a guaranty that other stock issued as preferred, was in fact common under an agreement with the holder, and deposited a sum

of money to secure the buyer against damage for breach of the guaranty. *Held*, that failure of the guaranty did not entitle the buyer to recover any part of the deposit, in the absence of proof of damage.

*Appeal from Polk District Court.*— HON. A. H. McVEY, Judge.

MONDAY, JUNE 13, 1904.

THE issue finally determined in this case by the lower court arose on cross-petition of M. Frankel against Jacob S. Emery and Arthur Reynolds, in which it was alleged that, in connection with a purchase by Frankel from Emery of seven hundred and eighty-two shares of common stock in the Harris-Emery Company, the sum of $1,600 of the amount to be paid to Emery was deposited with Reynolds, awaiting the determination of the question whether certain other outstanding stock of the corporation was preferred stock — that question being material in determining the price to be paid by Frankel for the stock purchased by him — and that said outstanding stock was in fact preferred stock, contrary to the representations of Emery, and it is asked that Frankel have judgment against Emery and Reynolds for the payment to Frankel of the $1,600 so deposited. The substantial allegations of the cross-petition were denied by Emery, and a decree was rendered awarding $527.36 of the sum in controversy to Frankel, and the balance to Emery. Each of these two parties appeals.— *Modified* and *affirmed*.

*N. T. Guernsey*, for S. Frankel.

*Charles L. Powell*, for Jacob S. Emery and Arthur Reynolds.

McCLAIN, J.— The action was originally brought by Pendleton, as trustee for Manix & Co., to compel the Harris-

Emery Company to treat certain shares of stock held by Pendleton for the benefit of Manix & Co. as preferred stock, rather than common stock. But before a decision was rendered, it was shown to the court that the Pendleton stock had been taken up and canceled by the Harris-Emery Company, and the sole question left for decision was that arising on Frankel's cross-petition against Emery and Reynolds, as set out in the above statement. The important facts bearing upon the question finally determined are as follows: In January, 1900, Pendleton was the owner of the legal title to one hundred and twenty-five shares of preferred stock, of the par value of $100 per share, in the Harris-Emery Company, a corporation carrying on a dry goods business in the city of Des Moines. The characteristics distinguishing such preferred stock from common stock were that it was issued to employes of the Harris-Emery Company, that it could be retired at par by the company whenever the owner ceased to be an employe of the company, that the holder was guaranteed a dividend of eight per cent. per annum, and that the holder was not entitled to vote it at the stockholders' meetings. At this time the capital of the corporation was somewhat impaired, chiefly by reason of a recent loss by fire, and it was represented to Pendleton, who was about to quit the service of the company, that the stockholders were about to make good this loss, and that it was considered desirable not to continue the plan of having preferred stock outstanding; and thereupon the following instrument was executed, signed by Pendleton and by the Harris-Emery Company, by its treasurer, which instrument will hereafter be referred to as the waiver.

Whereas, Harris-Emery Company, a corporation of Polk County, Iowa, desires to retire all of the preferred stock of said corporation now outstanding, as it may do under its said articles of incorporation; and,

Whereas, E. S. Pendleton holds in his own right and name one hundred and twenty-five (125) shares of Class ' A ' of the preferred stock, represented by certificates as follows: Certificate No. 33, five shares Certificate No. 16, five shares;

Certificate No. 45, ten shares; Certificate No. 56, ten shares; Certificate No. 57, five shares; Certificate No. 61, sixty shares, and Certificate No. 71, thirty shares.

Now therefore: In Consideration of said Pendleton waiving all rights as the holder of said stock to said stock as preferred over the common stock of this corporation, said Harris-Emery Company hereby agree to allow said stock to stand as it now is and not to retire the same as long as held and owned by said Pendleton.

In March, 1901, Frankel and Emery entered into an agreement by which the former secured an option on the purchase of 782 shares of common stock, constituting a majority of the common stock of the corporation, the price to be the book value on January 15, 1901 and a bonus of a specified sum. During the negotiations leading up to the execution of the instrument of option, the status of the Pendleton stock as common or preferred was discussed as bearing on the question of the book value, and the facts were disclosed to Frankel on which Emery based his claim that this stock was common, and not preferred, in view of the waiver. In the option contract this clause is found:

Fifth. The said Emery in order to induce the sale of said stock has represented and guaranteed. * * * (c) That the capital stock of said company now outstanding is sixteen hundred and twelve shares, and not more, of which fourteen hundred and eighty-two shares are common stock, and the remainder preferred stock.

It is conceded that in this guaranty the Pendleton stock was considered common stock, and that, if in fact it was preferred stock, the guaranty was to that extent untrue. When Frankel exercised his option of purchase under this contract, the following instrument was executed, and the sum of $1,600 was paid to Reynolds as therein provided:

Whereas, Jacob S. Emery has this day sold to the Frankels seven hundred and eighty-two shares of common stock of the Harris-Emery Company under a guaranty that the whole amount of common stock in said corporation is fourteen hundred and eighty-two shares, and

Whereas, some question has arisen as to whether or not the stock owned by E. S. Pendleton is common or preferred stock, and,

Whereas, in said guaranty said stock of E. S. Pendleton is guaranteed to be common stock.

Now, it is agreed that said Jacob S. Emery shall deposit with Arthur Reynolds $1,600 to be held by said Reynolds, for the benefit of the persons who may ultimately be entitled thereto under the contracts between the parties when it is determined whether said stock is common or preferred.

M. Frankel,<br>Jacob S. Emery.

Received $1,600 above referred to April 16, 1901.

Arthur Reynolds.

It is the contention of counsel for Frankel that, notwithstanding the waiver, and for reasons hereafter to be more fully set out, the Pendleton stock was in fact preferred stock; that the book value of the common stock was less by about $2 per share than it would have been, had the Pendleton stock been in fact common stock, as guaranteed; and that Frankel is therefore shown to be entitled to recover the sum of $1,600 thus deposited with Reynolds. Counsel for Emery contends, on the other hand, that the Pendleton stock was in fact common stock, and that, even if it was, technically, preferred stock, notwithstanding the waiver, Frankel has shown no damage resulting from the untruthfulness of the guaranty, inasmuch as the guaranteed dividends paid on preferred stock have not exceeded those which were in fact paid on common stock, and therefore Emery is entitled to the fund.

It is evident that the effect of the so-called waiver is very material, in one view of the case, and we first consider that question. It is clear to us that, as between Pendleton 1. AGREEMENT TO WAIVE SPECIAL VALUE. and the Harris-Emery Company, the effect of this waiver, if valid, was to deprive Pendleton of any enhanced value which his stock would otherwise have had as preferred stock, and to put it on a

level with common stock, so far as it was to be taken into. account in determining the book value of the common stock. This was plainly the intention of the parties, whether we look only at the language of the instrument itself, or seek to gather its meaning from the language used in view of the circumstances under which it was executed. It is expressly stipulated that Pendleton, in consideration of being allowed to retain his stock, waives all rights as holder of such stock as preferred. Frankel was not negotiating for the purchase of the Pendleton stock, and its character was, under his option contract, material to him only so far as it would affect the book value of the common stock which he was purchasing from Emery. He knew when he entered into the option contract that Emery was treating the Pendleton stock as common stock, and the effect of the guaranty was to protect him from any damage he might suffer with reference to the price which he should pay for the common stock to be bought from Emery by reason of the Pendleton stock being established as preferred stock, and it was with reference to this controversy that the $1,600 deposit to cover damages which might accrue from breach of Emery's warrant that this was common stock, was made with Reynolds. This deposit was evidently not made as a wager on the determination of the abstract question whether technically the Pendleton stock should be established to be common or preferred stock, as the case might be, but as security for damages suffered, if by reason of the untruthfulness of the guaranty, it should turn out that he had paid for the stock purchased from Emery more than its book value would have been if computed on the proper basis.

Having determined that the effect of the waiver, if valid, was to make the Pendleton stock common stock, so far as Frankel is concerned, the next question is as to its validity, for it is contended that it was executed without authority, so far as the Harris-Emery Company was concerned, and that Pendleton

2. ESTOPPEL: ultra vires agreement.

was not the owner of the stock in such sense that he could affect its character by his contract. As to the power of the officers of the company to enter into this contract of waiver, we think Frankel is not in a position to raise any question. The officers who transacted the company's business made it; the directors knew of it, and took no steps to disavow it; no stockholder ever complained of it; and, after Frankel became a stockholder and the president of the company, the stock was taken up and canceled without any objection on his part. Indeed, in an earlier stage of this very action, Frankel, as president of the corporation, as against Pendleton's claim, in behalf of Manix & Co., that the stock was preferred, interposed a defense predicated upon this waiver. In our judgment, Frankel ought not to be heard to say, for the purpose of his individual action against Emery, that the act of the officers of the company in executing the waiver did not bind the company. The validity of this waiver was necessarily involved in this action, as originally brought; but after the Harris-Emery Company, through Frankel, as its president, has retired the stock, and terminated the litigation so far as the company is concerned, it is not open to Frankel, in his individual capacity, to contend that the waiver was executed without authority, or was *ultra vires,* so far as the corporation was concerned.

The objection that Pendleton was not the holder of the stock, in such sense as to have authority to determine its character by execution of the waiver, is based on facts which have not yet been stated. By some arrangement with Manix & Co., Pendleton, who about that time became a member of that firm, used forty shares of this stock as a contribution to its capital. It appears, however, that, whether the fact and effect of the waiver were known to Manix & Co. or not, that firm had no interest in the stock, save as to the dividends, which were to be treated as profits of the partnership. The dividends having been paid, and the stock retired, we do not see that the

3. CORPORATE STOCK: AGREEMENT AFFECTING ITS VALUE.

authority of Pendleton to execute the waiver as to these forty shares can now be questioned. The waiver has become a thing executed and completed, so. far as this stock is concerned. Moreover, the evidence satisfies us that Pendleton had such interest in this portion of the stock at the time the waiver was executed that he could contract as to its character, for the interest of Manix & Co. was acquired afterwards. True, if the waiver was not known to the other members of the firm, they might insist that it was not binding as to them, but no such question is now in the case.

At the time the waiver was executed, the remainder of the Pendleton stock (eighty-five shares) was held by the Marquardt Savings Bank as collateral security for a loan to

**4. CORPORATE STOCK: agreement affecting value; evidence.** Pendleton, and it may be conceded that the Savings Bank would not be bound by any contract as to this stock made between Pendleton and the Harris-Emery Company, and that in its hands, and so far as its interests were concerned, or the interests of any one to whom it might have been sold in enforcement of the pledge, such stock would still have retained its character as preferred stock. But the obligation of Pendleton to the bank has been fully discharged, and the stock, as already stated, has been taken up and canceled. No one is now in position to say that Pendleton had not authority to make this stock common stock. As pledgor, Pendleton remained the real owner of the stock for every purpose, and could do whatever he saw fit with it, subject to the pledgor's lien. The pledgor could have consented to the waiver. It is not for Frankel to say that the waiver was invalid because of the want of consent. The court seems to have reached the conclusion that, to the extent of the actual indebtedness of Pendleton to the Savings Bank, the stock held by it was not affected by the waiver, and therefore was preferred stock, within the terms of the stipulation under which the $1,600 in controversy was deposited with Reynolds, and, on that view, to have awarded $527.36 of that amount to Frankel. But we cannot see how the possible or continger⁺

rights of the Bank could have affected the book value of the stock purchased by Frankel from Emery. If Pendleton, as owner of this stock, actually reduced such stock to common stock by a waiver valid and binding, so far as he was concerned, can it be said that the possibility that the pledgee, holding stock of the value of $8,500 as security for a debt of about $4,000, might be driven to insist on having the stock treated as preferred in its hands, would have affected the book value of Emery's common stock; in other words, that Frankel would, under his contract, have been entitled to buy the Emery stock for $527.36 less than the amount he actually did pay for it?

This brings us back to the final contention of counsel for Frankel. He insists, in effect, that Frankel had the right, under his option, to have the Emery stock at its book 5. SALE OF value; that the book value would have been CORPORATE STOCK: at the time of his purchase $2 less if the Pen- breach of guaranty; dleton stock had been figured as preferred stock; damages. and that, regardless of any damage which may have accrued to him, he suffered loss to the extent of $2 per share because the Pendleton stock was not figured as preferred stock. The argument is plausible, but not convincing. He (Frankel) agreed to pay the book value according to a computation which had already been made on the books of the company, and which showed that the Pendleton stock was common stock, and that on that basis the Emery stock was worth $78 per share. He had no agreement that he should pay $2 less per share if the Pendleton was in fact preferred stock. To cover that contingency, he took a guaranty of Emery that the Pendleton stock was common stock. For breach of the guaranty he had a right of action for damages, and perhaps he had a remedy by rescission if he had sought it. The deposit of $1,600 was to cover any damages he should suffer by breach of the guaranty if it should turn out to be untrue in its assurances. The deposit was not a wager as to the technical character of the Pendleton stock, but a security

against damages under the guaranty. There is no evidence that Frankel has suffered any damage, nor is there any evidence that Frankel would have got the Emery stock at $76 per share under any conditions. Perhaps the bookkeeper for the Harris-Emery Company, who placed the value of the stock on the books as of date January 15, 1901, testifies that, if he had treated the Pendleton stock as preferred, he would have entered that value as $76 per share; but Frankel knew that it was entered as of the value of $78 per share, and he took his option contract on that basis. He can now complain only as to damages sustained, and none have been shown.

Our conclusion is that Frankel has not established his right to recover any part of the $1,600 deposited with Reynolds, and that judgment should have been rendered for Emery for the entire amount of the fund. The decree of the trial court will be modified accordingly, and Emery may have judgment for the entire amount in this court, or in the lower court, as he may elect.— MODIFIED and AFFIRMED.