JONES v. BONANZA MIN. & MILL. CO. et al.

No. 1848. Decided July 16, 1907 (91 Pac. 273).

1. CORPORATIONS—OFFICERS AND AGENTS—DE FACTO OFFICERS. All irregularities in a corporate election, the legality thereof, as well as the legal qualifications of the officers elected, are settled by the election as against a collateral attack.[1]

2. SAME—MEETINGS OF DIRECTORS—STATUTORY PROVISIONS. A provision in articles of incorporation that a new board of directors shall organize within a time specified after their election is directory merely.

---

[1] Hatch v. Lucky Bill Mining Company, 25 Utah 405, 71 Pac. 865.

3. SAME—STOCK—ASSESSMENT—VALIDITY. Articles of incorporation of a mining company provided that no assessment should be levied while there was treasury stock remaining in the treasury. At the time of levy of an assessment shares of such stock were undisposed of and in the treasury, but had no salable or other substantial value. *Held*, that the fact alone that such stock was undisposed of did not render the assessment void.[2]

4. SAME—DE FACTO OFFICERS. A director who, when elected, did not hold sufficient shares of stock to qualify him for that office under the articles of incorporation, but did hold the required amount at the time an assessment was levied on the stock of the corporation by the board, was at least a *de facto* officer, and the assessment as against a collateral attack was valid.

5. SAME. Stockholders, who not only had means of knowledge respecting all the circumstances of an assessment on their stock, but about the time it was levied and before the sale of their stock to pay the assessment made an investigation of the acts of the board of directors through a competent lawyer, and could thus have arrested the consequences of the assessment had they desired to do so, cannot thereafter complain of its invalidity.[3]

6. APPEAL—REVIEW—FINDINGS OF FACT—CONCLUSIVENESS. Findings of fact by the trial court in an equity case are conclusive, unless clearly contrary to the evidence.

7. CORPORATIONS—ACTIONS—LACHES. Stockholders of a mining corporation, who apply to a court of equity for its interference to protect their rights against the consequences of alleged wrongful acts of the directors, must act with reasonable diligence, or present some good excuse for not having done so.

8. SAME—EVIDENCE—SUFFICIENCY. Evidence, in an action to enjoin defendants from acting as the officers and board of directors of a corporation and from holding a stockholders' meeting and from making a sale of the corporate property, *held* not to establish fraud in obtaining an option on the stock of plaintiff and his associates and a proxy therefor and in failing to enter into a bond and lease.

9. SAME. Evidence, in an action to enjoin defendants from acting as the officers and board of directors of a corporation and from holding a stockholders' meeting and from making a sale of the corporate property, *held* not to show reasonable diligence by plaintiff to correct the wrongful acts charged.

2 Gary v. York Mining Company, 9 Utah 464, 35 Pac. 494; Nelson v. Keith-O'Brien Company (Utah), 91 Pac. 30.

3 Hatch v. Lucky Bill Mining Company, 25 Utah 505, 71 Pac. 865.

APPEAL from District Court, Fifth District; Joshua Greenwood, Judge.

Action by George Jones against the Bonanza Mining & Milling Company and others. From a judgment for plaintiff, defendants appeal.

REVERSED, WITH DIRECTIONS TO DISMISS THE ACTION.

*W. A. Lee* for appellants.

*Henderson, Pierce, Critchlow & Barrette* and *B. N. C. Stott* for respondent.

FRICK, J.

This action was commenced by plaintiff, hereinafter designated respondent, against the defendants, who are appellants in this court, to enjoin them from acting as the officers and board of directors of the Bonanza Mining & Milling Company, a Utah mining corporation, and to enjoin them from holding a certain stockholders' meeting, and from entering into negotiations for and from making a sale of the property of said company, and for general relief. A restraining order was duly issued pending the hearing on the merits, and upon final hearing the individual defendant E. G. Jones, and four others who were not made parties to the action, were removed as officers and directors of said company, and others reinstated into such offices, and the appellant E. G. Jones and the four other members of the board of directors were enjoined from holding any stockholders' or directors' meeting. They were enjoined from offering for sale or selling the property of said corporation, and from transacting any of its business; and all acts of the board of directors of said corporation from and after March 9, 1903, including the acts on said date, were held illegal and void. The court further decreed that the plaintiff and his associates still were the owners of and entitled to the stock which was sold on the assessment hereinafter referred to. From the findings and the decree as made by the court, appellants prosecute this appeal.

Appellants' attorney has assigned over eighty errors, but has massed them into eight groups, and nearly all of them in some way relate to errors of the court in granting the injunction and other relief mentioned above. We shall not attempt to discuss the assignments separately, nor even do so in groups. The case may be determined upon the question as to whether under the whole evidence the respondent is entitled to the relief prayed for, or to any relief in this action. The complaint, findings of fact, conclusions of law, and decree cover eighty-three pages of the printed abstract, and the bill of exceptions containing the transcript of the evidence is composed of 663 pages of typewritten matter. In view of this it is utterly impossible within the limits of this opinion to attempt even a summarized statement of the pleadings and findings; nor of the evidence adduced at the trial. We will refer to such parts in the opinion as may be deemed necessary to a clear understanding with regard to the conclusions reached.

The principal matters relied on in the complaint consist of three separate agreements, all dated at Robinson, Utah. Febuary 16, 1903, namely: (1) An agreement signed by one Ed. Mingle whereby he agreed to enter into a bond and lease with the Bonanza Mining & Milling Company "upon certain mining property in Juab county, Utah, upon terms and conditions this day agreed upon and to be agreed upon on or before April 1, 1903, or in the event of my failure so to do to forfeit and return that certain power of attorney and option to purchase this day given me by D. A. Depue, George Jones, Raymond Jones, A. J. Underwood, and the Tintic Lumber Company;" (2) an agreement by the parties last above named as stockholders of the Bonanza Mining & Milling Company to said Ed. Mingle giving him an option on 176,604 shares of the capital stock of said company at the rate of five cents per share to remain in force unconditionally until April 1, 1904; and (3) a power of attorney or proxy by the five parties above named to said Ed. Mingle whereby he was given the right to vote said shares of stock in the same manner and to the same extent as the parties could do if pres-

ent at any meeting, and "reserving only from this power the right to sell or incumber said shares of stock, it being understood that the powers and authority hereby delegated shall for a period of one year from April 1, 1903, next be irrevocable and shall run jointly with that certain option or options to purchase the shares of stock now owned by us this day given to said Mingle." The two last agreements were signed by the five parties named, and the first one was signed by Ed. Mingle alone. It is also alleged in an amended complaint that the bond and lease mentioned in the first of the three agreements above mentioned were entered into, and the court so finds in findings 13 and 14; but there is no evidence to sustain these allegations or findings and respondent's attorney at the trial, as the bill of exceptions discloses, disclaimed such to have been the fact. He, therefore, rests his claim for relief upon the fact that Mingle should have entered into such a bond and lease, but that he fraudulently failed to do so.

After the three agreements had been entered into a stockholders' meeting of the Bonanza Mining & Milling Company was duly called to be held at its office at Robinson, Juab county, at which, according to the notice therefor, a new board of directors was to be elected for said company; authority to bond and lease the property to be obtained from the stockholders and to "ratify the action of the board of directors taken at said meeting." This meeting was duly held at the time and place designated in the notice and one Wardlaw, holding the proxy given to Mingle with the consent and direction of respondent, who was secretary of the Bonanza Company, and D. A. Depue, its president, elected a new board of directors. We remark here that at the annual stockholders' meeting of said company, held in the month of January, 1903, as appears from the recorded proceedings of that meeting, the old officers were continued in office until the stockholders should elect others. At the stockholders' meeting held on March 9, 1903, Mingle was not present, nor was the appellant C. W. Jones. When this meeting adjourned, the newly elected directors, as is claimed by respondent, were to meet on the same day at Salt Lake city to organize while the appellants claim such

meeting was to be held on May 9th following. In this connection the record of that meeting shows that "March" was changed by substituting "May" therefor. How or when such change was made, or who made it, the evidence fails to make clear. The fact, however, is that the new board did not meet until May, 1903, at which time two of the newly elected members, who were not consulted when elected, could not serve, and the board was filled by the others who qualified by taking the usual director's oath of office as provided by law and thereafter filed the same with the county clerk of Juab county. Afterwards, on June 6, 1903, another director was appointed in place of one who resigned on that day, and the one appointed duly qualified on June 9th by taking the oath of office and duly filed the same on June 22d. This board from and after May 11, 1903, conducted all the corporate business of the Bonanza Company during the year 1903, and in January, 1904, at the annual stockholders' meeting duly called and held at the office of the company at Robinson, Juab county, Utah, a new board of directors was elected, who duly qualified, and the same proceeding was had in January, 1905. On July 10, 1903, the board of directors, composed of the members elected and appointed as above stated, levied an assessment of one-fourth of one cent per share upon the whole of the outstanding capital stock of the Bonanza Company. The notice of this assessment was regularly published in a newspaper, and copies of the notice were mailed to the stockholders. The respondent and his associates received this notice, and protested against the assessment upon the ground that they had no stock except that on which they had given an option to Mingle and that he should either do the assessment work under his bond and lease or else take care of the assesssment upon their stock. The officers of the company, however, disclaimed any knowledge of such an option or of any agreement to that effect, and insisted on the assessment being paid with the view of obtaining money to keep the mining claims of the company in good standing. Respondent and his associates, as they admit, consulted a lawyer at the time with respect to the regularity of the assessment; and the offi-

cers, as respondent admits, offered back at that time to him and his associates all the books, records, and matters pertaining to the affairs of the company if they would take charge of the corporate affairs and pay the debts necessarily incurred, which appeared of small consequence. But respondent refused to do this. The sale of the delinquent stock was postponed pending the controversy, but, no understanding having been arrived at, the sale took place October 3, 1903. At this sale 229,484 out of about 295,000 shares then issued were offered for sale as delinquent. Out of this number the officers of the company bid in for its benefit for want of bidders, 168,-956 shares. J. G. Campbell, the then president, bought 33,720 shares, and N. B. Campbell, the then secretary, bought 23,808 shares, and J. A. Lloyd, a director, bought 3,000 shares. From this it appears that the assessment of one-fourth of one cent per share was paid on about 66,000 shares out of the whole capital stock of 300,000 shares, for which the corporation was incorporated. The whole amount thus realized from this assessment, from the assessments paid and stock sold as above set forth, amounted to about $300, or only sufficient to keep three out of the seven mining claims owned by the company in good standing if there were no other expenses.

It further appeared that the officers, before the assessment was levied, made frequent attempts to dispose of treasury stock to raise money to defray the necessary expences of the corporation, and that they had disposed of treasury stock, realizing about two cents per share therefor, but could not find sale for any more, so that at the time the assessment was levied there were about five thousand shares of the treasury stock undisposed of; but it is not seriously contended by any one that those shares had any market or other substantial value at that time, or that they were saleable. It further appeared that at least two assessments had been levied on the stock prior to the assessment of July, 1903, and that when these assessments were levied there was a large amount of stock in the treasury and unsaleable, and that respondent and his associates assented to these first two assessments, all

of which were levied and collected as provided by law. They, however, claim that these assessments were voluntary. The records show them to have been levied and enforced under the statute. The evidence is wholly insufficient to show that any money was obtained by any one connected with the company after March 9, 1903, that was not accounted for, except it be the money the Campbells and Lloyd obtained for the stock they bid for and bought at the assessment sale and no one seems to make any claim upon them therefor. The evidence is clear that at the time the corporate affairs were turned over by plaintiff and his associates there was no money in the treasury, and the company was free from debt. The mining claims were mere locations on which the assessment work had to be done each year to retain them as the property of the company, and it was upon these claims, seven in number, that the corporation was formed and the stock issued. After the assessment sale in 1903, and in the beginning of October, 1904, the appellant, C. W. Jones, with about ten others, some of whom were his relatives residing in the state of Wisconsin, through correspondence with him, bought a large amount of the stock which had been bid in by the company and the Campbells at the assessment sale, and thus said persons became stockholders of the company, obtaining through that and other sources the controlling interest, which they held at the time of the trial. It is this stock that was by the court decreed to have been obtained illegally and through the fraudulent acts of C. W. Jones and Ed Mingle, and of which acts the court finds these Wisconsin stockholders to have had knowledge or the means of knowledge. The fraud, as we understand the findings of the court and the argument of respondent's counsel, consisted in the acts of Ed. Mingle and C. W. Jones in obtaining the option and proxy on the stock of respondent and his associates in February, 1903, and in failing to enter into the bond and lease whereby Mingle had the right to purchase the property of the company for $15,000 at any time prior to April 1, 1904. It is too obvious to require argument that if Mingle failed to enter into this bond and lease he simply forfeited the right to purchase the

property. This was a right given him, and the mere failure to comply with it would, at least not by itself, constitute a fraud on any one. But it is asserted that the power of attorney or proxy to vote stock depend on this bond and lease, and in case Mingle failed to enter into the bond and lease the proxy was void and of no further effect. But the power of attorney or proxy in this regard speaks for itself. We have quoted the conditions imposed therein, and none such are contained in the proxy itself. The proxy, however, says that it is irrevocable for the period of time named therein, namely to April 1, 1904, this being the date on which the option or right to purchase the 176,000 and odd shares of the stock owned by respondent and his associates terminated.

In this connection it is not easy to see why Mingle should want an option to purchase the property at precisely the same figure he had an option to purchase the stock apart from the fact that respondent wanted Mingle to advance for them $700 for assessment work for which Mingle received absolutely no consideration in view of the right he had to purchase the stock. This fact also shows that there was no good reason why respondent and his associates wanted the bond and lease, except to obtain from Mingle the assessment work. Be that as it may, the election of the board of directors of March 9, 1903, was not based upon the condition that the election should be void if Mingle failed to enter into the bond and lease. This, however, is the claim now made by respondent's attorney, and, as he asserted at the trial, this whole case is based upon such claim. The agreement discloses no such condition, and it seems to us that to permit the authority of the board of directors and officers of a corporation to rest upon such a frail tenure would be a reproach to both law and morals. Whatever the rule might be in case of a direct and timely attack made against the directors elected upon such a condition, we think it too obvious to require discussion that such condition, even if absolutely established, could have no effect whatever on a collateral attack against the acts of the directors. All irregularities in corporate elections, and even the

legality thereof, as well as the legal qualifications of the directors, are settled by the election in so far as collateral attacks are concerned. This is the clear weight of authority as is made manifest by reference to the following authorities where the cases are collected and cited: 2 Cook on Corporations, sec. 713; 3 Thomp. Comms. on Corp, secs. 3893-3895; 3 Clark & Marsh. on Priv. Corp., sec. 662. To the same effect is *Hatch v. Lucky Bill Min. Co.*, 25 Utah 405, 71 Pac. 865. But if we pass this by for the present and give respondent the benefit of the right to impose other conditions than those named in the agreement, what then are his rights in a court of equity as regards the acts of the board of directors elected March 9, 1903? He and his associates held the majority of the issued stock at that time, and joined in the election according to their own statements. They knew who the directors were, and they all wanted the new board to take charge of the corporate affairs. They turned all of them over, and the new board took them, not conditionally, but unconditionally. If thus Mingle was to enter into a bond and lease in less than a month from that time, why is it that neither of the interested parties ever took either the time or the pains to inquire about it? They however, were informed within a very few months thereafter that Mingle had not entered into a bond and lease, and that the acting officers claimed to know nothing about his agreement to do so. Respondent thus knew all about it. Moreover, respondent was then offered restitution of the property and affairs of the company. This was all Mingle offered to return in case he failed to enter into the bond and lease. Respondent refused to accept this, and yet it was just what he was entitled to if Mingle failed to comply with the alleged agreement to enter into a bond and lease.

At this time the stock remained unsold—the assessment unenforced. If respondent and his associates had taken charge then, they could have recalled the assessment under the statute, and, if they desired, could have provided the means required to protect the mining claims in some other

32 Utah—29

way. They did not want this. What they wanted was that Mingle should do the assessment work when, according to their own contention, the matter was optional with him to do it or not. The right to purchase which Mingle had was contingent at best, and if he refused to perform he forfeited this right, nothing more. As a legal proposition, then, how could Mingle perpetrate a fraud upon any one by neglecting to do that which was at his option to do or not to do? But it is contended that the articles of incorporation provided that the new board should organize within thirty days after their election; that this was not done, and hence the election was void. The articles do not provide that in the event this was not done such a result or any result would follow, and hence the provision must be deemed to be directory merely. The board did organize, qualify, and thereafter acted as a board. It is also asserted that the levying of the assessment was void because the articles provided that no assessment should be levied while there was treasury stock remaining in the treasury and that there were about five thousand shares of such stock undisposed of when this assessment was levied. It, however, appears from the articles that this stock should be disposed of by the directors for development purposes and to conduct the affairs of the company. It was contemplated, therefore, that something should be realized from the stock for the purposes named. No one contends that these five thousand shares had any saleable or other substantial value at the time the assessment was levied. Indeed this is proved by the facts and circumstances in relation to the sale of the stock for the assessment. There were over 168,000 shares bid in for the company at the sale. No one would pay the nominal price of one-fourth of a cent a share therefor. Moreover, from the acts of respondent and his associates at that time, it is clear that they did not want the stock, even at that price. It is no answer to say that they relied on Mingle to do the assessment work under the bond and lease. They then knew he was not doing it, and that he was not likely to do it and pay five cents per share for stock that no one seemed to want at one-fourth of a cent, when the highest obligation resting upon him was

a mere option to buy it. But under the ruling of this court in *Gary v. York Min. Co.,* 9 Utah 464, 35 Pac. 494, and under the more recent holding in *Nelson v. Keith-O'Brien Co., Ante,* p. 396, 91 Pac. 30, decided this term, the mere fact that there was some stock in the treasury would, under the circumstances in this case, not make the assessment void.

But it is further contended that at least one of the directors, appointed in May, 1903, to fill the vacancy occasioned by the failure of the two to qualify, vitiated the acts of the board in levying the assessment for the reason that the acting director was not eligible as a director when elected because not holding sufficient shares of stock to qualify him under the articles of incorporation. The records, however, affirmatively show that at the time the assessment was levied he was a stockholder in amount sufficient to qualify him as such, and hence until removed from office was at least a *de facto* if not a *de jure* director, and the acts of the board of which he was a member were not subject to collateral attack, under the authorities above cited. The assessment was therefore not void, but at most might perhaps have been directly attack for irregularities, if action in some proper form had been taken in time. In view that the respondent and his associates not only had means of knowledge respecting all the circumstances of the assessment, but about the time it was levied and before the sale made an investigation of the acts of the board through a competent lawyer, and could thus have arrested the consequences of the assessment had they desired to do so, they cannot now be heard to complain in a court of equity for the reasons urged by them. The facts and circumstances of this case bring it squarely within the decision of *Hatch v. Lucky Bill Min. Co., supra.* The irregularities in that case were in some respects much greater than in this case, and the equities much stronger, and still the court refused relief from the assessment there involved. Counsel for respondent, however, seeks to distinguish this case from the *Hatch Case* upon the ground of fraud, which, it is asserted, makes it peculiarly one for equitable relief. In a proper case this contention would be of great force, and might be conclusive, but the difficulty

encountered by this record is that the evidence is wholly insufficient to establish the alleged fraud. If it were conceded that Mr. Mingle practiced fraud in entering into the agreements and in obtaining possession of the proxy to vote the stock, still this would not, in view of all the facts and circumstances, permit respondent to set aside and hold for naught all the acts and proceedings of the board of directors elected under the proxy, and under the direction of respondent and his assocites and with their consent. But we cannot conceive why Mingle should have intended fraud or wrong in entering into the agreements. The evidence clearly demonstrates that he did not profit to any extent by doing so. Morever, it is not apparent how he could have profited by it. If the property turned out all right, he had the right to purchase the stock for five cents a share by paying therefor. If he thought the property was not worth it, he could refuse to exercise his option. The same result followed if he had entered into the bond and lease; the only difference being that under it, in order to exercise the right to purchase the property apart from the stock, he would have to do at least the assessment work on the seven claims. The benefit from this would, of course, have been for the stockholders. Respondent and his associates, however, were advised before the sale of the stock upon the assessment that Mingle was not going on with the bond and lease. They were told by the officers that they knew nothing about such a bond and lease. Mr. Mingle would thus have forfeited his right under the bond and lease even if it had been executed. This respondent was bound to know. When, therefore, the officers offered to return to him the corporate affairs, he was offered all that the agreements provided for. This he would not accept, but permitted the directors to get on as best they could in raising funds to hold the mining claims; permitted the sale of the stock to take place and thereafter to be sold to the Wisconsin people and after about two years of inaction, and after the purchasers of the stock had invested their money, respondent seeks to be reinstated into all his rights as of March 9, 1903, upon the sole ground that Mingle had committed a fraud and that the sub-

sequent purchasers of the stock knew, or had the means of knowing, all about Mingle's fraudulent acts, and this knowledge he sought to bring home to them from the various proceedings as recorded in the records of the meetings of the board of directors. But in the meantime the annual stockholders' meetings were held in January, 1904, and in January, 1905, at which at least some new men were elected upon the board of directors. These meetings were advertised and publicly held as required by law, and respondent, nor any of his associates, seemed to manifest any interest in the matter, although they knew, or ought to have known that Mingle was neither holding these meetings nor interested in them under the proxy; that they were held under the stock purchased by others under the assessment sale. Under such circumstances it would be most inequitable to permit respondent to attack in this way, and after such a lapse of time, the acts of those who conducted the corporate affairs under a claim of right, and who thereby kept intact the corporate property and the mining claims from being forfeited.

We have read with great care and attention the entire evidence contained in the original bill of exceptions. We did this for the reason that the respondent contends that the findings of the trial court are conclusive upon us, unless clearly contrary to the evidence. We concede this to be the rule adopted by this court in equity cases. But there are also other elementary rules in force in all courts of equity, which are, that he who seeks equity must do equity; that he who charges fraud assumes the burden of establishing it; and, finally, that when a party comes into a court to obtain relief from the acts of others in matters such as are involved in this case, he must act with reasonable diligence or present some good excuse for not having done so, or he must fail in his action. The foregoing doctrine is especially applicable, and is generally enforced in cases like the one at bar. (*Great W. M. Co. v. Woodmas A. M. Co.,* 14 Colo. 90, 23 Pac. 908; *Rabe v. Dunlap,* 51 N. J. Eq. 40, 25 Atl. 959; *Speidel v. Henrici,* 120 U. S. 387.

7 Sup. Ct. 610, 30 L. Ed. 718; *Harwood v. Railroad Co.,* 17 Wall. [U. S.] 78, 21 L. Ed. 558.)

The evidence in this case utterly fails to establish fraud. The most that can be said is that there are some facts from which one might conjecture fraud and that is insufficient. The evidence equally fails to show any reasonable diligence upon the part of respondent to correct the alleged wrongful acts, and he offers no excuse why he did not act sooner. The evidence, therefore, fails to sustain the findings upon which the decree is based, and it thus cannot stand, for want of support. With regard to the lack of diligence to prosecute this action, and the failure to take appropriate action in proper time in the absence of fraud, the case of *Hatch v. Lucky Bill Min. Co.,* supra, is conclusive, and leaves us no alternative but to reverse the judgment upon that ground as well. This view makes it unnecessary to pass upon the question whether the court exceeded its power in removing officers not before the court and in reinstating others in an action like this. It is also apparent from the entire record that the plaintiff cannot make a proper case for relief at this time under the facts as set forth in the complaint, or under any proper amendment thereof.

The judgment, therefore, is reversed, with directions to the district court to dismiss the action. Appellant to recover costs.

McCARTY, C. J., and STRAUP, J., concur.