T. A. ROSSING et al., Appellants, v. STATE BANK OF BODE et al., Appellees.

CORPORATIONS:   Members and Stockholders—Meetings—Voting
1   by Proxy. Voting by *proxy* is apparently (?) authorized by articles of incorporation which provide for dissolution upon a vote "of stockholders *representing* a three-fourths majority of all stock then issued."

CORPORATIONS:   Members and Stockholders—Meetings—Usage as
2   Justifying Voting by Proxy. Usage may justify the voting of corporate stock by proxy.

CORPORATIONS: Members and Stockholders—Meetings—Proxies—Necessity for Prompt Objection. Voting stock by proxy, though not formally provided for, is valid unless prompt objection is made when the votes are offered.

CORPORATIONS: Members and Stockholders—Dissolution—Sale of Assets. Majority stockholders have the absolute right to sell the assets of a duly dissolved corporation to another corporation controlled by them, *provided the sale is fair.*

CORPORATIONS: Dissolution—Fraud in Subsequent Sale of Assets—Effect. A voluntary dissolution of a corporation by the majority stockholders, in accordance with the articles of incorporation and statute law governing, is in no manner affected by subsequent fraud in the sale of the assets.

CORPORATIONS: Dissolution—Voluntary Dissolution—Reasonableness—Banks and Banking. Not whether a voluntary dissolution of a corporation by the majority stockholders was reasonable, but whether it was in accordance with law and the articles of incorporation.

CORPORATIONS: Dissolution—Finality. The court may not resurrect and give life to a corporation which has been voluntarily and validly dissolved by majority stockholders, or which has had its life terminated *ipso facto* by the expiration of its corporate existence.

CORPORATIONS: Members and Stockholders—Right to Assets of Undissolved Corporation. Individual stockholders may not have the court apportion to them a share of the assets of an undissolved corporation.

CORPORATIONS: Dissolution—Rights of Minority Stockholders. Whatever illegality may be lodged against the acts of majority stockholders in dissolving a corporation and selling its assets to a corporation newly organized by said majority stockholders, the court has no power to give to minority stockholders in the defunct corporation an interest in the new corporation when the new corporation has stockholders who were not stockholders in the dissolved corporation and *who are not parties to the action.*

CORPORATIONS: Members and Stockholders—Majority Ordering Dissolution—Nonexistence of Trust Relation. Majority stockholders who validly order a dissolution of the corporation, buy its assets at a fair price, and convey them to their own newly organized corporation, violate no trust relations with the minority stockholders.

CORPORATIONS:    Dissolution—Rights of Minority Stockholders. The plea that a stockholder voted for the dissolution of the corporation and the sale of its assets on the mere "understanding" or "expectation" on his part that he would get the same interest in a new corporation, which was to be organized, as he held in the dissolved corporation, is wholly insufficient on which to decree a trust in his favor against the property of the new corporation, especially when the court does not have jurisdiction of *all* stockholders in the new corporation.

EQUITY:    Decree—Praying Impossible Relief—General Prayer. Prayers for *impossible* relief do not, in equity under a general prayer, ordinarily bar all relief; yet it is suggested that a litigant may so pin his faith to impossible relief as to bar the granting of the possible.

CORPORATIONS:    Dissolution—Sale of Assets—Non-Necessity for Public Sale. A *private* sale of the assets of a dissolved corporation is unimpeachable if just as much was realized as would have been realized had the sale been public.

CORPORATIONS:    Dissolution—Sale of Assets—"Good Will" as Element of Value. "Good will,"—that element of value which attends the business of a *going* concern, and which consists of the probability that old customers will continue to be customers,—becomes legally nonexistent instantly upon the *closing out of the business.* So held where, on the *dissolution* of an incorporated bank, the majority stockholders, who purchased the tangible assets at a fair price, were held non-chargeable for alleged "good-will" value, even though said assets were by them transferred to a new banking corporation organized and controlled by them.

BANKS AND BANKING:    Officers, Etc.—Powers—Compensation of Employees—Ratification. The board of directors of a banking corporation has ample power to fix the compensation of its employees, and, in reference thereto, to ratify subsequently what formerly had been informally authorized.

*Appeal from Humboldt District Court.*—N. J. LEE, Judge.

NOVEMBER 28, 1917.

THIS is a suit in equity, in which the plaintiffs, who were stockholders in the defendant the State Bank of Bode, complain of the dissolution of that bank, the sale of its assets,

and the formation of the defendant State Savings Bank of Bode, asserting that all these things should be held fraudulent as to plaintiffs, and praying, among other things, that plaintiffs should be given such interest in the new bank as they owned in the old.    They claim further that the directorate of the old bank wrongfully allowed defendant Hanson commissions on the making of farm loans, which should have been received by the old bank, of which Hanson was cashier.    The district court dismissed the petition of the plaintiffs, and they appeal.—*Affirmed.*

*O. T. Gulliæson* and *E. A. & W. H. Morling,* for appellants.

*Kenyon, Kelleher, O'Connor & Price* and *F. M. Miles,* for appellees.

SALINGER, J.—I.    The plaintiffs seek relief on the allegation, in substance, that the dissolution of the old and the formation of the new bank should be set aside because both acts were a fraudulent scheme on part of those defendants who control both banks to transfer the assets and good will of the old bank to the new, and to exclude plaintiffs from sharing in the new to the extent of the value of their shares in the old.    If the corporation was dissolved, and the new bank has stockholders not in court, how is such relief possible?

1. CORPORATIONS: members and stockholders: meetings: voting by proxy.

Undoubtedly, a court of equity may set aside a sale where one who controls buyer and seller so sells the property of one to the other as that a fraud is worked upon minority shareholders.    Such relief has often been given. *Manufacturers' Sav. Bank v. O'Reilly,* (Mo.) 10 S. W. 865; *Abbott v. American Hard Rubber Co.,* 33 Barb. (N. Y.) 578, 588; *Conro v. Port Henry Iron Co.,* 12 Barb. (N. Y.) 27, 64; 3 Cook on Corporations (7th Ed.), 2113.    In *Mason v. Pewabic Min. Co.,* 10 Sup. Ct. Rep. 224, that being still

possible, the prayer granted was that the minority may have the property publicly sold. But all that can give no standing to a prayer which asks impossible relief. It will be remembered that the "setting aside" which the plaintiffs pray is in effect a demand that the court decree the old bank is not dissolved; that this is so because the new bank *is* the old bank; and that the plaintiffs, therefore, shall have such share in the new bank as equals the one they had in the old bank. If the State Bank of Bode *is* dead, no court can give it life. Aside from complaint of things that were done in winding up its affairs *after* dissolution, there is no challenge of the legality of the dissolution itself, beyond an allegation that plaintiffs have neither knowledge nor information sufficient to form a belief "whether the said proceedings for dissolution were in form conformable to the articles of incorporation and with the law of the state of Iowa." The only attack made by the evidence is that voting by proxy was not authorized formally, and that without such votes the dissolution and winding up by sale was ordered by less votes than the articles of incorporation require. It is doubtful whether an allegation that plaintiffs do not know whether the "proceedings for dissolution" conformed to the articles and to the laws of the state raises whether proxy voting was authorized. But grant it does, and the fact remains that this objection is either untenable, waived, or both. The statute provides that a corporation may be dissolved "in accordance with the provisions of its articles." Code, Section 1617. The articles here provide for a dissolution upon a vote "of the stockholders *representing* a three-fourths majority of all stock then issued," which would seem to recognize a vote by representation,—i. e., by proxy; and the vote on dissolution was declared to be, and treated as, valid. The votes were counted, and it was found, in accordance with the practice of the corporation, that 295 shares were repre-

sented, and declared by the president that the resolution was adopted. All this was unchallenged. The declaration was preliminary to proceeding with the business of the meeting. Those who now assert illegality voted proxies. The bank record reciting all this voting and action on the vote was received in evidence without objection. Though voting by proxy were not formally provided

2. CORPORATIONS: members and stockholders: meetings: usage as justifying voting by proxy.

for, it must still be recognized now, because according to usage, and of having been dealt with as valid. See *Graebner v. Post,* (Wis.) 96 N. W. 783; *Pendleton v. Harris-Emery Co.,* 124 Iowa 361; *Jones v. Bonanza Min. & Mill. Co.,* (Utah) 91 Pac. 273. The practice was not only permissible because of usage, but this particular voting was permitted and not objected to, and so made now unobjectionable.

3. CORPORATIONS: members and stockholders: meetings: proxies: necessity for prompt objection.

It is a principle of corporation law that the legality of an election will not be inquired into upon the ground that illegal votes were cast, unless those votes were challenged at the election at the time when they were cast. 2 Cook on Corporations (7th Ed.), 1827. All irregularities in a corporate election, the legality thereof, as well as the legal qualifications of the officers elected, are settled by the election as against a collateral attack. *Jones v. Bonanza Min. & Mill Co.,* (Utah) 91 Pac. 273. Though a proxy cannot vote when the owner of the stock is present and votes, yet the alternative proxy may vote the stock even though the principal proxy is present, no one objecting. 2 Cook on Corporations (7th Ed.), 1785. The ordinary proxy, being intended to be for an election merely, does not enable the proxy to vote to dissolve the corporation, or to sell the entire corporate business and property, or to vote upon other important business, unless the proxy itself is general, or in special terms gives

the power to vote on such questions. But where the stock-holder does not promptly object, he may be.bound. *Graeb-ner v. Post,* (Wis.) 96 N. W. 783, 784. The validity of a corporate election is not affected by the fact that an alternative in proxies voted the stock when the principal attorney was present, where none of the shareholders who executed the proxies complained of, and all of them subsequently formally ratified, the action of the alternative. *Commonwealth v. Roydhouse,* (Pa.) 82 Atl. 74. A stock-holder is bound by the action of his proxy at a stockholders' meeting, unless he exercises the most active diligence in repudiating the same, where he knows or should have known what was done at the meeting. *Synnott v. Cumberland Bldg. Loan Assn.,* 117 Fed. 379. Neither *McKee v. Home Savings & Trust* Co., 122 Iowa 731, nor *Stewart v. Pierce,* 116 Iowa 733, hold anything that is material on this point. The first decides merely that, in a situation where what was done can be undone by the courts, and the statute says that one may vote by proxy but that no person shall vote more than 10 per cent. of the outstanding shares at the time of the election, one who votes more than that number of shares cannot by such vote carry a proposition, and that this applies to more than voting for the election of bank officers. The other is that, where the court finds that a stockholder owns one half the stock of a corporation, the other stockholders may properly be enjoined from voting more than one half thereof.

### 1-a

4. Corporations: members and stockholders: dissolution: sale of assets.

The majority has power to order dissolution and the sale of the assets upon such vote as was here had. It had power even to sell it to itself. The courts will closely scrutinize the fairness of such a sale, but that does not affect the original power to make it. One corporation

may lawfully sell its assets to another corporation com-
posed in greater part of the majority stockholders of the
selling company. *Mumford v. Ecuador Development Co.*,
111 Fed. 639, 643. The mere fact that directors sell prop-
erty of their corporation to a new corporation of which
they are directors and stockholders will not make the sale
absolutely void. *Manufacturers' Sav. Bank v. O'Reilly*,
(Mo.) 10 S. W. 865. And so though the sellers control both
corporations. *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543;
*Olsen v. Homestead Land & Imp. Co.*, (Texas) 28 S. W.
944; *Smith v. Stone*, (Wyo.) 128 Pac. 612. Where a sale
is made from one corporation to another, and the directors
of one are largely interested in the stock of the other, or
the same person or persons own a majority of the stock of
both corporations, such sale is not void nor constructively
fraudulent, but will be avoided by actual fraud, or if an
undue advantage is taken or unconscionable bargain made.
3 Cook on Corporations (7th Ed.), 2113. And see *Beid-
enkopf v. Des Moines Life Ins. Co.*, 160 Iowa 629, 649. As
said in *Plimpton v. Bigelow*, 93 N. Y. 592:

"The right which a shareholder in a corporation has by
reason of his ownership of shares, is a right to participate
according to the amount of his stock in the surplus profits
of the corporation on a division, and ultimately, on its dis-
solution, in the assets remaining after payment of its
debts."

In *Price v. Holcomb*, 89 Iowa 123, speaking to a claim
that, under the rule governing a purchase of trust property
by the trustee, the holder of the majority of stock cannot
buy the property of the corporation, we said that such stock-
holder's relation was not that "of agent or trustee, but a
joint owner," and, while "an agent or trustee, is charged
with the interests of his principal or *cestui que trust*, and
cannot have any interest adverse thereto. Not so, however,
as to a stockholder. He has his own interests to protect,

and is not charged with the care of the interests of the other stockholders. They act for themselves."

See *Windmuller v. Standard Distilling & Distributing Co.,* 114 Fed. 491.

5. CORPORATIONS: dissolution: fraud in subsequent sale of assets: effect.

We do not go into the question for what the sale will be avoided, because, as the majority had the power to dissolve and wind up and sell to anyone, including itself, no fraud in the subsequent sale can affect that original power. When the requisite vote ordered dissolution, the corporation became, *ipso facto,* dissolved, no matter what the motive that induced the vote. No actionable wrong can arise from doing by lawful means what there is lawful right to do.

6. CORPORATIONS: dissolution: voluntary dissolution: reasonableness: banks and banking.

In *Watkins v. National Bank,* (Kan.) 32 Pac. 914, it is said that a national bank may go into liquidation and be closed by a vote of its shareholders owning two thirds of its stock; and this right may be exercised although it may be contrary to the wishes, and against the interest, of the owners of the minority of the stock. It is held in *Windmuller v. Standard Distilling & Distributing Co.,* 114 Fed. 491, that a stockholder may, in stockholders' meeting, vote on any measure, even though he has a personal interest therein separate from, or adverse to, that of other stockholders, and may vote for a dissolution, even though he is influenced to that course by a wish to terminate a contract beneficial to the corporation, but onerous to himself; and in *Green v. Bennett,* (Texas) 110 S. W. 108, that shareholders owning two thirds of its stock may vote to liquidate the bank, though they are the directors and the executive officers thereof; since they, as directors and officers, owe no duty to dissenting minority stockholders to continue the bank, where they do not desire so to do. Appellants cite *Beidenkopf v. Des Moines Life Ins.*

Co., 160 Iowa 629, 641, presumably because it has some language that a dissolution is justified where it is ordered without fraud, upon reasonable grounds, and is for the best interests of all concerned. If that were its decision,—and it is not,—we are not prepared to say the power to dissolve was arbitrarily exercised. Had we the question whether the dissolution was justified, many things indicate there was a preconceived plan to have a majority of the stockholders buy the assets on dissolution, and to open the new bank, which is a defendant. While this is so, it cannot be said that entertaining and carrying out such a plan was necessarily even a moral wrong, and, as such, unjustified. It is plain there was great friction between those who are ranged on opposing sides in this suit. Plaintiff Captain Rossing expressed himself to the effect that defendant Hanson couldn't be believed on anything, which seems to have been after the captain had become angered because he was retired from the directorate. Some of the plaintiffs promoted the organization of a national bank as a rival, and when the other faction acted to bring about dissolution, this rival had already proved quite injurious, which we think is undeniable, notwithstanding there is strained evidence attempting to show that the creation of such a rival is really a benefit to the old institution. We find good reasons, too, for not renewing the charter of a bank capitalized at $30,000, and for organizing a new bank with less capital and with these contending factions eliminated. Plaintiff Gullison admits it would not have been "good business" to renew the charter, in view of the existence of the new national bank. But the *Beidenkopf* case does not *decide* that the required vote can dissolve only if its action is reasonable. It does say that, if certain conditions exist, the courts will not interfere for a dissenting minority. It does not say there will be such interference where those conditions do not exist. *Price v. Holcomb*, 89 Iowa 123, is of

like effect in statement. What the *Beidenkopf* case decides, and we now approve, is this:

(a)  By change in statute, a dissolution need no longer have unanimous support, but it suffices if it have such vote as is stipulated in the articles of incorporation.

(b)  Every stockholder impliedly agrees, in becoming a member, that the management and control of the corporate business and interest shall be vested in the majority, and that *Platner v. Kirby,* 138 Iowa 259, at 265, is supported by precedent in saying that "in this state we have recognized the right of a majority to determine whether the corporation shall be continued, or shall be wound up."

(c)  Such majority has a discretionary power in the matter of dissolving.

(d)  While an article of incorporation majority may dissolve because the corporation is insolvent, it may do so though the corporation is not insolvent—which is as well the holding of *Green v. Bennett,* (Texas) 110 S. W. 108.

(e)  Such majority may wind up if, in its judgment, there is reason to believe that, at some time in the future, the business may not prove satisfactory, and that, when the acts of the majority are impugned by the minority, the courts will hold that the policy and wisdom of the act is a matter of business, and not judicial judgment, and will not set the judgment of the court against it.

(f)  There is no implied contract to
7. CORPORATIONS : remain in business, and the courts will do
dissolution :
finality.         nothing which is in effect ordering specific performance of such claimed implied agreement. Nor is the fact that the required vote ordered dissolution, all. The charter would have expired by limitation on March 1st. The dissolution was ordered in October preceding. Section 1618-a, Supplement to the Code, 1913, provides that to continue the corporate existence of a state bank necessitates an affirmative vote of two thirds

of the shareholders at a stockholders' meeting held for that purpose, and called upon a notice signed by at least two of the officers of the bank, and by a majority of the directors. Unless its existence is continued in manner fixed by law, the corporate life expires, *ipso facto* and without any direct action, at the time fixed by charter for expiration. 10 Cyc. 1271. It is made plain that no such vote could be had for renewal. Between the time at which dissolution was ordered and March 1st, nothing was left of the charter except the power and duty to liquidate. *Muscatine Western R. Co. v. Horton,* 38 Iowa 33, at 45; *Stewart v. Pierce,* 116 Iowa 733, 749, 750. If it could be claimed that the vote to dissolve left more than this, the old bank is now dead, because the charter is dead. We have no power to do the impossible. We can no more decree that bank into life than we can add to the term of a tenant, when we find after the claimed term has expired that he should not have been dispossessed. And plaintiffs sue

8. CORPORATIONS: members and stockholders: right to assets of undissolved corporation.

as individual shareholders, and their pleadings are framed to obtain only such relief as could be given if the State Bank of Bode is a dissolved corporation. They have no right to maintain suit as individuals, unless the corporation is no longer existing. If the corporation is existing, it and not its stockholders must sue. *Troutman v. Carnival Co.,* 142 Iowa 140, 145; *De La Vergne Refrigerator Mach. Co. v. German Savings Institution,* 20 Sup. Ct. Rep. 20; *Judy v. Beckwith,* 137 Iowa 24; *Morrow v. Gould,* 145 Iowa 1, 4. This is certainly so unless the corporation refuses to sue or demand. *Kennedy v. Citizens' Nat. Bank,* 128 Iowa 561; *Smith v. Stone,* (Wyo.) 128 Pac. 613; and *Dillon v. Lee,* 110 Iowa 156. In the last, it is said this requirement and rule is not changed because, in a suit by members of a corporation by its treasurer, the defendants were among those in control of the corporation when such profit was

made, and that, if the corporation was in existence at the time the action arose, the fact that it was dissolved at the time the suit was brought did not relieve plaintiffs from showing demand and refusal of the corporation to bring the suit. Plaintiff might as well ask that a court of equity decree a disintegrated corpse shall be dealt with as being quick.

9. CORPORATIONS: dissolution: rights of minority stockholders.

Just as impossible is the relief asked as to the new bank. To be sure, the plaintiffs speak of a "pretended" new bank; but they also say—and it is the fact—that the new bank "is now doing business as a state savings bank and conducting business as such at Bode, Iowa," on authority from the state. And it is manifest that, no matter what complaints plaintiffs may justly make of the dissolution of the old and the organization of the new bank, we cannot, since other shareholders in the new bank are not made parties, give to plaintiffs an interest in the new bank without taking from the shares of those over whom we have no jurisdiction. As said in *Leurey v. Bank*, (La.) 58 So. 1022, the amount of the capital stock of a corporation being fixed by its charter and divided into aliquot parts, it is no more possible to add parts in excess of the number which constitutes the whole than it would be to add another to the two halves which constitute any whole thing.

10. CORPORATIONS: members and stockholders: majority ordering dissolution: nonexistence of trust relation.

The prayer which asks the impression of a trust, the removal of the defendants as trustees, and the like, asks what is not impossible, but it does ask what the law will not give. As has been seen, the relation between stockholders who disagree as to what shall be done is not a trust relation. On such division of opinion they assume an adversative relation, at least in such sense as that those who prevail because they are in the majority, may not, therefore, be held to have violated a

trust. If this be not so, the assertion of a trust would always be available to have the courts nullify any action of the majority which remained unsatisfactory to the minority.

11. CORPORA-
TIONS: disso-
lution: rights
of minority
stockholders.

We do not see what relief the plaintiffs can base upon the fact that Captain Rossing claims he voted to dissolve and to have the assets sold because it was his understanding that he and others should have as much of a share in the new bank as they had in the one to be dissolved. If there were no other difficulty, it is an insuperable one that the "understanding" of the witness is all there is, and that there is no evidence of any agreement to do what the captain understood or believed was going to be done, even if that were possible. The utmost his testimony comes to is that he voted in the understanding that all done was merely a form of reorganization for the purpose of renewing the charter and reducing the stock, and that he voted, "expecting to get stock." Be that as it may, it is, to say the least, extremely doubtful whether the result would have been changed if those who claim to have voted aye with said understanding had voted no. We cannot grant relief based on treating the dissolved bank as going. We cannot thrust the plaintiffs into the new bank at the expense of parties not before us. We should not impress a trust upon the new bank nor deal with its officers as trustees for plaintiff. The old bank *is* dissolved, and the plaintiffs have no interest in the new one. This much must stand, be the consequences what they may, and whatever may or may not be the remedy available to plaintiffs.

### 1-b

12. EQUITY: de-
cree: praying
impossible re-
lief: general
prayer.

But that one seeks relief which cannot or should not be granted does not work to deny him any relief to which the petition and its prayer for general relief entitle him. For instance, while *Green v. Bennett,*

(Texas) 110 S. W. 108, refused to give the complainant a proportionate share of the stock of the new bank, it held that dissenting minority stockholders had a remedy against the liquidating committee for injuries resulting from the failure of the committee to properly dispose of the assets of the bank.

That impossible relief is sought is, as said, no bar to possible relief. Indeed, it may fairly be held that, even where possible and impossible relief is sought in the alternative, the possible is not an alternative at all, but is all that is sought and expected. But, of course, even possible relief may not be due. In this case plaintiff alleges all he does as a reason why all done should be nullified—the equivalent of asking a rescission. The only specific prayer for a money judgment is for the sum got by Hanson for farm loan commission, which it is claimed he was improperly allowed to divert from his employer, the bank. There is not a suggestion in pleading that damages are sought for conversion of either property or good will of the old bank. Rescission and restoration by setting aside is the object. The brief points make no claim for damages, or complaint that the stock of plaintiff is worth more than defendants offer. It is doubtful, to say the least, whether appellant may, in argument, mend holds and change from the claim that the sale is a nullity to one that damages are due because the purchase price is too small. See *Pollitz v. Wabash R. Co.*, (N. Y.) 167 Fed. 145; *Smith v. Stone*, (Wyo.) 128 Pac. 612; *Farmers' Milling Co. v. Mill Owners Mut. Fire Ins. Co.*, 127 Iowa 314, 318; *Donley v. Porter*, 119 Iowa 542, 545; *Hawes v. Swanzey*, 123 Iowa 51; *Schillinger Bros. v. Bosch-Ryan Grain Co.*, 145 Iowa 750, 758; *Yoder v. Kalona Sav. Bank*, 142 Iowa 219; *Home Sav. Bank v. Morris*, 141 Iowa 560; *Wright v. Lieth*, 146 Iowa 290; *Criley v. Cassel*, 144 Iowa 685; *Farmers & Merchants Bank v. Wood Bros. & Co.*, 143 Iowa 635. But, as both parties

have seen fit to litigate the question of damages, we shall proceed as though the pleadings tendered the issue tried out.

II. Some claim is made that the sale was not public; that no opportunity for general bidding was given; and that, were it not for the conduct of defendants, more than was could have been realized from the

13. CORPORA-
TIONS: dis-
solution: sale
of assets:·
non-necessity
for public
sale.

sale. The plaintiffs knew the sale was ordered. Most of them voted for the order. While they claim defendants designed that no one else should bid, plaintiffs admit they could have bid, and that they were neither willing nor able to. They admit, in effect, that no amount of publicity and no public sale would have produced a buyer, except in the plaintiffs or the defendants. When a public sale would get no more than was got, private sale is not a fatal objection. One stockholder may buy all the property at a public sale thereof. *Price v. Holcomb,* 89 Iowa 123. If the price be fair and adequate, there is no overreaching, all that is ordered and done is public, and the minority have full opportunity to bid and buy, it is not material that the sale was not at public vendue. *Linsley v. Strang,* 149 Iowa 690, 691; *Roberts v. Herzog,* (Minn.) 124 N. W. 997; *Kessler & Co. v. Ensley Co.,* (Ala.) 141 Fed. 130; *Pewabic Min. Co. v. Mason,* 12 Sup. Ct. Rep. 887; *Baker v. Seattle-Tacoma Power Co.,* (Wash.) 112 Pac. 647; *Buell v. Buckingham & Co.,* 16 Iowa 284; *Clark v. American Coal Co.,* 86 Iowa 436; *Taylor v. Lovett,* 87 Iowa 177, 178. It is said in *Phillips v. Steam Engine Co.,* (R. I.) 45 L. R. A. 560, that a sale fair to all concerned will not be set aside for the purpose of ordering an auction sale. All that is held by *Hart v. Mt. Pleasant Park Stock Co.,* 97 Iowa 353, cited by appellants, is that one who is an agent of an association, and also stockholder in a company, can base no rights upon a clause in a contract between the two which he inserted without authority, and which was repudiated as soon as

discovered. The plaintiffs neither wanted to keep their shares in the old nor take part in the new bank. It is admitted over and again that the complaint is of the price offered for their stock. If that be a fair price, plaintiffs have not been injured by failure to have public vendue. There would have been no suit, were defendants willing to pay plaintiffs $2 a share instead of a round $1.20. There is practically no dispute but that defendants are offering enough, so far as the value of the tangible assets sold are concerned. There is a claim that there was bad and slow paper, and that more than value was paid for the bills receivable. We do not think the attack on this paper is to be taken seriously. On the other hand, plaintiffs complain that the bank building and the fixtures were unjustifiably dealt with as being worth $3,000 and $1,000, respectively, when in fact worth $4,000 and $1,250. We think the lower value the correct one. Complaint that improvements were made and wrongfully charged to real estate, we think is trifling.

14. CORPORATIONS: dissolution: sale of assets: "good will" as element of value.

So it all narrows to whether more than book value should be allowed. In *Green v. Bennett,* (Texas) 110 S. W. 108, the owners of two thirds of the stock of a solvent national bank, who were also its directors and executive officers, voted to liquidate the bank, and organized a new bank, and apportioned the stock thereof among themselves, to the exclusion of minority stockholders of the old bank. They elected themselves directors and officers of the new bank; and, through a liquidating committee composed of themselves, they transferred the assets of the old bank to the new. It is held that the transaction is not void, but is subject to the closest scrutiny on the part of a court of equity, and subject to be set aside on its being shown that it was not conducted with the utmost fairness, to the end that full value and the best price obtainable may

be realized; and that, since the minority stockholders had only the right to demand that the assets of the old bank be disposed of so that the full value thereof should be received for distribution among shareholders, they could not complain of the transaction, in the absence of a showing that the sales were not for full value, and on as favorable terms as could be obtained.

## 2-a

The great question is whether those who dissolved the corporation and wound it up and bought its tangible assets should be dealt with as if they had continued the old bank, had bought its good will, and not paid for 'it. The crux is whether defendants are in that position, and, if so, what is the value of this "good will." We are of opinion they are not in that position. If the bank was dissolved, it ceased to be a going concern, and no good will was left. Appellants concede that this is the holding of *Green v. Bennett*, (Texas) 110 S. W. 108. Our leading case on the subject, *Millspaugh Laundry v. First Nat. Bank of Sioux City*, 120 Iowa 1, so holds when the business was ended by an authorized foreclosure: that the one who forecloses and thereby destroys the business has done no wrong, and cannot be guilty of a conversion of the good will, because the exercise of his rights worked that there was no good will to convert. While selling the property of a party on foreclosure is not ordering a dissolution and a sale of the property in carrying out the dissolution, the two acts invoke the same rule: that, when a business is closed out, there is no good will left. The witnesses in this trial finally agreed, in substance, that the fact that the concern is no longer going will at least greatly reduce the value of the good will. We think it a fair view of the whole of the evidence that it would be of no value. It is held in *Bell v. Ellis*, 33 Cal. 620, *Farwell v. Huling*, (Ill.) 23 N. E. 438,

and *Rice v. Angell,* (Texas) 11 S. W. 338, that it impairs the value of good will that the business is not profitable. It must follow that, if the business is defunct, its "good will" has no value. If the property necessary to carry on the business is all sold, and a theretofore existing partnership has been in fact dissolved, there is nothing left of good will, and no good will to be converted (*Lobeck v. Lee,* [Neb.] 55 N. W. 650, which seems to have been approved in *Bradbury v. Wells,* 138 Iowa 673, at 680).

If there be in fact a dissolution, it does not matter that surviving partners, in the absence of a restrictive agreement on their part, carry on the same line of business as was transacted by the firm, and at the same place, and they may do so without accounting for the value of such of the good will of said firm as thereby accrued to them. *Lobeck v. Lee,* (Neb.) 55 N. W. 650. This was held in *Musselman & Clarkson's Appeal,* 62 Pa. St. 81, where, after a banking firm had dissolved and appointed a partner to liquidate, he, immediately following the dissolution, commenced banking in the firm's house on his own account, and under the firm name, while at the same time settling the firm business at that place. It is said that, if he had sold the good will, he would have been obliged to have accounted for the value received; but, in the absence of such sale or agreement on his part to pay for it, and his not selling it as such, he was under no liability to pay for good will; that this is so because—

"There was no relinquishment of business by the partners. Their business expired by its own limitation. They had no *exclusive* right in the business that existed for a moment after the firm dissolved  *  *  *  ; and these are the criteria of property in good will under the English rule. *Kennedy v. Lee,* 3 Meriv. 441; Coll. on Part. 156; Story on Part., § 99."

The court adds that though, in its opinion, the rule has

been made more extensive by usage in Pennsylvania, "how can there be a good will of a business in favor of the members of a firm, where the firm has ceased by its own limitation, and no exclusive right to follow the business in that place belongs to them?" This is approved in *Lobeck v. Lee,* (Neb.) 55 N. W. 650, 654.

As some of the authorities put it, the good will arising from the sale of the property exists only in cases where such sale is compellable by some of the members of the partnership or the association; that, therefore, on the death of one partner, the good will is not stock upon which the executor of that partner can compel a division, because he cannot compel a sale of the whole premises. *Bradbury v. Wells,* 138 Iowa 673, at 680, citing with approval Collyer on Partnership, Section 162.

In *Slack v. Suddoth,* (Tenn.) 52 S. W. 182, a firm of dentists dissolved partnership, and complainant notified defendant that the partnership was dissolved. But before giving this notice, or perhaps on the day after, he rented another office in the same building, and near the head of the stairway where the old offices were. On the next day after the dissolution, he advertised in the papers that the partnership was dissolved and he was located for practice in an adjoining room in the same building, and put his sign up at his office door. The other partner remained in charge of the old office, and used such of the furniture and instruments as he needed or wished. Complainant thereupon filed a bill to wind up the partnership, asked that a receiver be appointed to take charge of the lease and property and sell the same, and that he be allowed to start the bidding at $2,000. Relief was denied upon the ground that here is a case wherein no forced sale or transfer can be made of a good will, and that good will implies something gained by consent.

## 2-b

The very definitions of "good will" demonstrate that it belongs to none but a going concern which continues the business sold to it,—that "stays at the old stand,"—a business handled as something other than "a closing-up transaction." *Ott v. Boring,* (Wis.) 121 N. W. 126. It is an element in the transfer "of a well-established business." *In re Graeser's Estate,* (Pa.) 79 Atl. 242. The most frequent definition of good will is that old customers will continue to be customers. *Halverson v. Walker,* (Utah) 112 Pac. 804; *Brown v. Benzinger,* (Md.) 84 Atl. 79.

Other cases on the rule of the prospect of the customers' going back are *Vonderbank v. Schmidt,* (La.) 10 So. 616; *Bergamini v. Bastian,* 35 La. Ann. 60; *Succession of Journe,* 21 La. Ann. 391; *Chittenden v. Witbeck,* (Mich.) 15 N. W. 526. *Cruttwell v. Lye,* 17 Ves. 335, says it is "the probability that the old customers will resort to the old place." *Williams v. Farrand,* (Mich.) 50 N. W. 446; *Meyers v. Kalamazoo Buggy Co.,* (Mich.) 19 N. W. 961 (20 N. W. 545). The Master of the Rolls, in *Wedderburn v. Wedderburn,* 22 Beav. 84, at 104, says: "It seems to be that species of connection in trade which induces customers to deal with a particular firm." It is said in *England v. Downs,* 6 Beav. 269, at 276, "It is the chance or probability that custom will be had at a certain place of business in consequence of the way in which that business has been previously carried on." Story on Partnership, Sec. 90, speaks of an advantage or benefit acquired "by establishment  *  *  *  in consequence of the general public patronage and encouragement which it receives from custom or habitual customers." It is said in *Williams v. Farrand,* (Mich.) 50 N. W. 446, that a retiring partner, in the absence of stipulation, and in addition to his interest in the tangible effects, parts simply with "the advantages that an established business possesses over a new enterprise. The old business is an assured suc-

cess, the new an experiment. The old business is a going business, and produces its accustomed profits on the day after the transfer. * * * The continuing partner gets these advantages. * * * He [the selling partner] sells only so much of the custom as will continue in spite of his retirement and activity."

It is said in *Cottrell v. Babcock Printing-Press Mfg. Co.*, (Conn.) 6 Atl. 791, at 797:

"By purchasing the good will merely, Cottrell secured the right to conduct the old business at the old stand, with the probability in his favor that the old customers would continue to go there."

In *Austen v. Boys*, 4 Jur. (N. S.) 719, 721, it was said:

"Where a trade is established in a particular place, the good will of that trade means nothing more than the sum of money which any person would be willing to give for the chance of being able to keep the trade connected with the place where it has been carried on. * * * It seems to have been intended to describe that interest which the retiring partner would have had if he had remained in the partnership, and which, by his retirement before its termination, he was willing to relinquish to the continuing partner."

In *Angier v. Webber*, 14 Allen (Mass.) 211, this is said:

"These facts show that the defendants have done acts which tend directly to deprive the plaintiff of the benefit of the reputation of the old firm, to take away from him the patronage which appertained to it, and to draw away the business of its habitual customers to which he had acquired a right by the purchase of the good will." .

How can there be customers continuing to deal with a closed-out establishment? As said by Mr. Justice Ladd in *Millspaugh Laundry v. First Nat. Bank of Sioux City*, 120 Iowa 1, if, by lawful conversion, the business is at an end, and the property disposed of, there cannot be left for appropriation that probability that customers might con-

tinue their patronage which is the element covered by some of the definitions.

### 2-c

Much of the law which treats good will as a thing of tangible value rests upon the holding that he who buys good will gets the benefit of eliminating a rival in the business bought; that the seller is bound not to impair the continued success of the business whose good will he transferred.  See·*Smith v. Gibbs,* 44 N. H. 335, 346; *Labouchere v. Dawson,* L. R. 13 Eq. 322; *Cottrell v. Babcock Printing-Press Co.,* (Conn.) 6 Atl. 791; *Churton v. Douglas,* Johns. Eng. Ch. 174; *Dwight v. Hamilton,* 113 Mass. 175; *Munsey v. Butterfield,* 133 Mass. 492; *French v. Parker,* (R. I.) 14 Atl. 870, at 873; *Rice v. Angell,* (Texas) 11 S. W. 338; *Brown v. Benzinger,* (Md.) 84 Atl. 79; *Howard v. Taylor,* (Ala.) 8 So. 36; *Knoedler v. Boussod,* 47 Fed. 465; *Meyers v. Kalamazoo Buggy Co.,* (Mich.) 19 N. W. 961 (20 N. W. 545); *Williams v. Farrand,* (Mich.) 50 N. W. 446, 451.

The fact that it is so often made the test of value that good will means that having established a happy reputation would make it probable old customers and new ones will resort to the business that has been sold, and that the breach consists of impairing that probability and absorbing those same customers in a rival business established, is an irresistible argument for the proposition that, when the authorities define what good will is, and what its value is, they have reference to a going business that has been transferred, and the owner of which complains of interference therewith, either while the business is still going, or because its going qualities have been destroyed or impaired by the one who sold the going business.  See *Smith v. Gibbs,* 44 N. H. 335, 343, 345; *Jackson v. Byrnes,* (Tenn.) 54 S. W. 984; *Nelson v. Hiatt,* (Neb.) 56 N. W. 1029, 1032; *Howard v. Taylor,* (Ala.) 8 So. 36; *Bradbury v. Wells,* 138 Iowa 673.

It is quite difficult to appreciate rivalry in or an im-

pairment of the business of a dissolved and wound-up bank. If there be a remedy, it is for doing what destroyed good will. No matter how wrong it was to destroy, there can be no recovery on the theory that the good will still exists and has been converted. No matter why a thing has ceased to be, no non-existent thing can be the subject of conversion.

2-d

The four cases most relied on by plaintiffs, *Knapp v. Reed*, (Neb.) 130 N. W. 430, at 434, *Inman v. Inkster*, (Neb.) 134 N. W. 265, *Lindemann v. Rusk*, (Wis.) 104 N. W. 119, and *Moore v. Rawson*, (Mass.) 70 N. E. 64 (85 N. E. 586), are not applicable. All have a central holding which, though differing as to circumstances and detail, is the same in all; and that is: If one partner or one managing stockholder in effect oust the other, seize the corporation or partnership business or property, and carry on the business as his own, he is to be dealt with as liable to account, among other things, for a conversion of the good will.

III.   The case could well be disposed of on the ground that the plaintiffs have estopped themselves by laches and acquiescence. But we have determined that, in view of the nature of the law questions presented on this appeal, the decision thereof should not rest upon that ground. See *Cowell v. City Water Supply Co.*, 130 Iowa 672; *Watkins v. National Bank of Lawrence*, (Kan.) 32 Pac. 914; *Beidenkopf v. Ins. Co.*, 160 Iowa 629, 649; *Baker v. Seattle-Tacoma Power Co.*, (Wash.) 112 Pac. 647; *Smith v. Stone*, (Wyo.) 128 Pac. 612; *Kessler v. Ensley*, (Ala.) 141 Fed. 130; *Jones v. Bonanza Min. & Mill. Co.*, (Utah) 91 Pac. 273.

IV.   Plaintiffs charge that the board of directors of the old bank wrongfully allowed Hanson farm loan commissions in from $1,000 to $1,200, which commissions belonged to the bank. It is responded that the allow-

15. BANKS AND
    BANKING:
    officers, etc.:
    powers: com-
    pensation of
    employees:
    ratification.

ance was rightful. It appears an allowance for clerk hire was made Hanson, and that he waived it in consideration of being allowed to keep what he could make out of farm commissions. Captain Rossing was then president, and was advised of this, did not disapprove of it, but failed to call a meeting so that formal authority for this arrangement might be given. But the arrangement was consummated, and later the board ratified what was done. There was no fraud, and no abuse of the discretion that the governing body had in the matter; and we agree with the trial court that plaintiffs are not entitled to recover anything on that account. See *Clark v. American Coal Co.*, 86 Iowa 436.

The decree is—*Affirmed.*

GAYNOR, C. J., LADD and EVANS, JJ., concur.