L. A. ANDREW, State Superintendent of Banking, Appellee, v. PEOPLES STATE BANK OF HUMBOLDT et al.; D. M. STERNS, Appellant.

No. 40561.

JANUARY 13, 1931.

650

*Helsell, McCall & Dolliver,* for appellant.

*Sullivan, McMahon & Linnan* and *T. S. Herrick,* for appellee.

EVANS, J.—The Peoples State Bank of Humboldt closed its doors on June 26, 1926. Its capital stock was $100,000. Its liabilities at the time of its closing were approximately $300,000. The value of its assets was approximately 50 per cent of its liabilities. It appeared from its stock book that the defendant Sterns was one of its stockholders, and that he held 95 shares of its stock. It is sought herein to recover an assessment on said stock, of 100 per cent. The seven defenses interposed included a general and specific denial of the allegations of the petition, and certain affirmative matters. The separately numbered affirmative defenses serve the function of analyzing the legal effect of certain features of the record. These defenses are summarized in the appellant's brief as follows:

"The defendant denied the insolvency of the bank, denied that the indebtedness paid by the receiver was the valid, legal indebtedness of the bank, denied that legal liability in excess of the sum of $100,000 was incurred during the time it is alleged defendant held stock in the bank. The defendant further answered that he never was the legal owner of the stock, but came into possession of it solely because the officers of the bank asked him to advance a 50 per cent assessment on stock that had been pledged as security for loans, in order that it might be redeemed and sold to subscribers whom the officers of the bank told defendant they had already secured. Further defense was made that the liability of the bank which resulted in its insolvency accrued prior to the time defendant is alleged to have been a stockholder. Defendant also pleaded a settlement, whereby the

examiner in charge, representing plaintiff, agreed to accept $4,000 in satisfaction of defendant's alleged stockholder's liability, together with $2,500 in settlement of his alleged liability as guarantor of a note in the bank. Further defense was made by the fifth division of the answer that the 50 per cent assessment paid by defendant in December, 1925, was an involuntary assessment, ordered by the state superintendent of banking, for which defendant was entitled to a credit on his liability, if any, as a stockholder. The last defense was that the bank continued to operate after the expiration of its charter, contrary to law, with the consent of the plaintiff superintendent of banking, and that defendant could not be held for liabilities thereafter accruing.''

The defendant became a stockholder, if such, on November 27, 1925, on which date he paid the consideration therefor. The stock was actually issued and delivered to him on December 5, 1925.

I. We deal first with the issues made by defendant's general and specific denials.

This division of the answer put in issue every allegation of the petition. The emphasis of the defense, however, was not concentrated on the mere denial. Without now considering the force and effect of any affirmative defense, we will say that the evidence was quite abundant to show a prima-facie case for plaintiff. The evidence is simplified by stipulations of fact. Pursuant to one of such stipulations, a referee was appointed, who was empowered to prepare and present a detailed summary of the daily business of the bank from November 27, 1925, to the date of its closing. Such a summary was presented by the referee, and was accepted as a verity by both parties. The defendant specifically denied that he was a stockholder. This denial, however, was a mere conclusion of law or fact, or both, and was predicated by the pleader upon facts pleaded in the affirmative defenses. The defendant did purchase 95 shares of stock, and did pay the purchase price thereof to his assignors, and did thereafter receive certificates of stock, pursuant to such purchase, and his name thereafter at all times appeared upon the stock and transfer books of the corporation, as a stockholder. He was, therefore, a stockholder, unless an affirmative avoidance is made to appear.

II. Due consideration being given to the contentions of the defendant, the facts leading up to the transaction under consider-

ation are approximately as follows: Prior to November 27, 1925, the defendant had no connection with, or interest in, the Peoples State Bank, except that a corporation with which he was connected was a depositor in said bank, and was often such to a very large amount. His mother (stepmother) was the owner of 125 shares of its stock, which stock comprised substantially all her means. His father was a debtor to the bank. The bank was infirm financially, and its capital seriously impaired. For the purpose of rehabilitating the impaired capital, an assessment of 50 per cent upon the stockholders, under the provisions of Section 9246, had been directed by the superintendent of banking, and had been ordered by the board of directors. It was apparently believed by all parties concerned that the collection of such an assessment would put the bank on a firm footing. 125 shares of the capital stock had been owned previously by Ayers and Corey. Each of these stockholders became insolvent, and all these shares passed into the hands of their creditors, and were held by such creditors as purported pledgees. Neither Ayers nor Corey was able to pay the 50 per cent assessment, nor able to recover the stock by redemption. It was the plan of the bank officials to obtain new subscribers for the purchase of this stock. Many subscribers had been solicited, and these had tentatively and severally promised to subscribe for a specified number of shares. The aid of the defendant was sought. He was an acquaintance and a friend of the bank officials', and was likewise interested in his mother's welfare and connection therewith. He declared his purpose not to continue as a stockholder, but did agree to become such temporarily, and to purchase the stock from the pledgees, and to pay the 50 per cent assessment thereon. This would enable the bank officials to sell these shares of stock to new subscribers. They had a list of such prospective subscribers, which was apparently sufficient to absorb the entire issue. The bank officials were directed by the defendant to sell such stock to said subscribers and to relieve him thereof, and such was his expectation. Many of the prospective subscribers failed to make the purchase, and only 30 shares of such quota were sold. This left the defendant with 95 shares on his hands. On May 10, 1926, the defendant assigned said shares to his mother, Myra Sterns, and directed her to obtain a transfer thereof on the books of the bank. Her husband took the assignment to Mr. Devine, and requested

him to give the same to the cashier of the bank, and to have the same entered upon the books of the bank. Devine was a subordinate employee of the bank, and not an officer. It does not appear that the delivery to him was made at the bank. But Devine did deliver the same to the cashier, who held it for conference with his superior officers. The result of such conference was that the bank officials deemed themselves without authority to enter a transfer upon their books which they believed to be colorable only, and no transfer was entered upon the bank books. The date of the assignment was May 10, 1926. The exact date of its presentation to the bank does not appear. It does appear that it was thus presented shortly after its execution.

Division II of defendant's answer presented his first affirmative defense. This was, in substance, that the bank officials were guilty of fraud in their representations to him, as an  inducement to his purchase of the stock. This division of the answer was stricken on motion, as presenting no defense. For the purpose of the record, the defendant was permitted to introduce his evidence in support of this defense. We therefore read his allegations in the light of his testimony. We are clear that neither the allegations nor the evidence disclosed fraud on the part of the bank officials. They were confessedly in trouble, and were seeking the assistance of new stockholders, to take the place of Ayers and Corey and their pledgees. No representations were made other than their belief that the 50 per cent assessment would repair their impairment. Their subsequent conduct was consistent with their expressed belief. All of them paid their 50 per cent assessment upon their own stock, and thereby acted to their own hurt, even as the defendant did. Nor did the defendant pay par value for the stock. He paid only $1,032, plus the 50 per cent assessment. This, however, was not to be the selling price to the purported new stockholders. If all the 95 shares had been successfully sold to new stockholders, the sum of $9,500 would have been realized. This sum would be much larger than the investment of defendant therein. Whether the margin was to inure to his benefit does not appear. The fact remains that the defendant necessarily knew that the stock was purchasable at much less than par value. It is to be noted further that the defendant had not, at any time before the closing of the bank, repudiated the

transaction nor sought to rescind the same. He realizes that it is too late to ask rescission now, and no rescission is sought in his pleading. Nor has he proved or claimed any damages for the fraud. It is sufficient here to say that the defendant did become a stockholder, and that he did so intentionally. The legal significance of the relation thus created was not affected by his purpose not to continue as a stockholder, nor was it affected by the fact that his act in becoming such stockholder was one of accommodation to his friends. The very method of accommodation which he adopted was *to become a stockholder*.

III. Another defense pleaded and relied on by the defendant is that, prior to the closing of the bank, and on or about May 10, 1926, he had disposed of his stock to his mother, Myra

Sterns, and that he had directed his mother to see that the stock was transferred upon the bank books. The argument devoted to this defense would command our earnest consideration, were it not for another feature of the record, which, to our minds, is quite fatal to the defendant on this issue.

It appears without dispute that the charter of this bank expired on May 9, 1926. The expiration of the charter terminated the legal existence of the corporation. From that date forward, it had no right to do business, except such as was fairly incidental to its liquidation. In a legal sense it became in process of dissolution upon the expiration of its charter. The duty of its officials from that time forth was to wind up its corporate affairs. *M. H. McCarthy Co. v. Dubuque District Court*, 201 Iowa 912; *Rossing v. State Bank of Bode*, 181 Iowa 1013, 1024. The method of transfer of stock upon the books of the bank was to cancel the stock of the assignor and to issue a new certificate to the assignee. A corporate official has no authority to issue stock after the expiration of the charter. Neither has a stockholder power thereafter to transfer his stock, in a statutory sense. Where such a transfer of stock is made in form, equity will treat it as an equitable assignment of all the net interest of the assignor in the corporate property after winding up its affairs. Such an assignment is not effective in law to make the assignee a *stockholder* of the corporation. On this question we quote a few excerpts from

*Richards v. Attleborough Nat. Bank,* 148 Mass. 187 (19 N. E. 353), as follows:

"When a corporation is dissolved and absolutely ceases to exist, that there can be no transfer of stock, as such, would, we presume, be conceded. When liquidation commences, all that is left to the stockholder is the right to a share in the assets, or the sum produced therefrom, proportional to his holding; while, in the case of national banks, he is subjected to a limited proportional liability for the debts the bank may have incurred. The equitable interest which he may have in the funds held by trustees, directors, or receiver, settling the affairs of the corporation on behalf of the stockholders, may be assigned, subject to the rights of creditors or the claims of the bank upon them; but such equitable assignee does not become a stockholder. When, after the expiration of the term for which the bank was chartered to do business, its existence is prolonged, and its franchise 'extended,' simply to collect its dues, pay its debts, and divide what remains among its shareholders, the same result must follow. *Crease v. Babcock,* 23 Pick. 334, 345. The reasons for making the stock, as such, transferable, and allowing the purchaser by virtue of his purchase to become a member of the corporation, cease to exist when there is no profit to be made, no business to be done, and when the property of the bank and its liabilities are fixed, and nothing remains but the adjustment of these. Whether the liquidation of the affairs of the bank be voluntary or involuntary, or whether it proceeds under the authority given to continue the bank in existence in order to close its affairs, it is necessarily implied that the respective rights, not only of the creditors and debtors of the bank, but of the stockholders, are to be determined as of the time when it commences. * * * When a bank is in liquidation, the liability of the stockholder for the debts of the corporation has been fixed. If there is a debt due from the bank, he cannot transfer to anyone else his liability to pay that debt, so as to affect the creditor, or subject him, in seeking such remedies as he may have against the stockholders, to any examination beyond the list of those who were so when the liquidation commenced. No further debts can be contracted thereafter, nor any transaction made, except such as result by implication from the duty of closing up its affairs."

Many authorities are cited in appellee's brief to the fore-

going proposition. We find none to the contrary. The rule of law here noted is fatal to the contention of the defendant that he had divested himself of liability as a stockholder by reason of his transfer to his mother on May 10, 1926. We need give no further attention, therefore, to this feature of the record.

IV. The further defense pressed by the appellant is predicated upon the fact that he paid the 50 per cent assessment levied upon the stock pursuant to Section 9246 *et seq.* The argument is that the levy of this assessment and the order therefor were coercive, and that the payment thereof was involuntary on his part, rather than voluntary. It is contended, therefore, that this assessment and the payment thereof should be deemed a part of the superadded liabilities of stockholders under the provision of Section 9251. It is contended that this feature of the case at bar differentiates it from our holding in *Andrew v. Farmers Tr. & Sav. Bank,* 204 Iowa 243, and *Leach v. Arthur Sav. Bank,* 203 Iowa 1052. It is true that, in the *Arthur Sav. Bank* case, we held that the stockholder had the option of paying the assessment or of subjecting his stock to sale and forfeiture for failure to pay, and that the payment of the assessment was voluntary, in the sense that the stockholder exercised his option in that direction. Under the statute then in force, there was no personal liability of the stockholder, such as is now provided by Section 9248-a1. We went no further in that case than to hold that the levy was not coercive. In the case of *Leach v. Arthur Sav. Bank,* we expressly reserved a holding on the point now urged by appellant. Therein we said:

"Whether such matters, if proven, would constitute a defense, or would entitle the stockholders to an offset against the superadded liability provided by statute, is a matter upon which we express no opinion, as there is no evidence in the record to support this contention."

The record before us precludes our present consideration of the same question. Whatever may be said of the coercive character of the order in the first instance, it was not coercive as to this defendant. He was not then a stockholder. If it be assumed that the then existing stockholders had grievance, yet they did not complain. The defendant purchased his stock voluntarily from

his assignors. The consideration which he promised to pay included the 50 per cent assessment as the principal part of the purchase price. He is in no position, therefore, to say that he was coerced into the payment.

It may be added here that the provision of Section 9251 is intended for the protection of creditors in the event of insolvency of the corporation. It is available only in case of insolvency, and only in favor of then existing creditors. It is never available to the corporation, as such. The provision of Section 9246 *et seq.* is intended for the benefit of the corporation, as such, and as a going concern. Whether the legislative body has exceeded its power in the enactment of this legislation is a question not involved herein. If it were so held, such holding would not aid the defendant in his present defense. If the levy of assessments upon the stockholders of a going concern were held to be in excess of legislative power, yet the collection of such assessments could not satisfy in whole or in part the obligation provided for in Section 9251. The beneficiaries of the two statutes are not identical. An improper award to one beneficiary could not satisfy, either in whole or in part, the legitimate demand of the other.

V. It is the further contention of the defendant that he is not chargeable as a stockholder, under Section 9251, for liabilities incurred prior to November 27, 1925; that he is liable only for liabilities arising after November 27, 1925, and before May 9, 1926; that, in any event, he is only liable for such liabilities as arose between November 27, 1925, and June 26, 1926.

In *Andrew v. Commercial State Bank,* 206 Iowa 1070, we put a construction upon this feature of the statute. Therein we said:

"The word 'accruing,' found in the statute governing double liability, must be construed to mean any liability within the purview of the statute, existing while a stockholder remained a stockholder. Clearly, any creditor of the bank had a right to look to all of the stockholders who were such at the time the debt existed and the bank became insolvent. The right to an assessment did not accrue until the bank became insolvent."

Section 9251 provides:

"9251. *Liability of stockholders.* All stockholders of savings and state banks shall be individually liable to the creditors

of such corporation of which they are stockholders over and above the amount of stock by them held therein and any amount paid thereon, to an amount equal to their respective shares, for all its liabilities accruing while they remained such stockholders.''

In the case at bar, it is stipulated that this bank was insolvent on November 27, 1925, and so continued up to the date of its closing. As relates to the period of time preceding the closing of the bank, such stipulation can mean only that the indebtedness of the bank exceeded the fair value of its assets. For the purpose of applying Section 9251, a bank is deemed solvent while it is a going concern. As a going concern, it remains in full control of its assets, and administers the same by its own corporate officials. The liability of the stockholder under Section 9251 accrues when the corporate bank ceases to be a going concern. Up to that point of time, the corporate bank pays all demands upon presentation. When it fails to meet such demands, its doors close. The trend of this argument is against the defendant. But we have no real occasion herein to pursue the argument further. It appears herein from the detailed report of the referee that the defendant could gain nothing by the adoption of his theory at this point. Whichever date be selected for the striking of a balance, the liability of the defendant would equal 100 per cent. Liabilities created and existing liabilities renewed after November 27, 1925, exceeded the liabilities existing on that date. For instance, the checking accounts existing November 27, 1925, totaled, in round numbers, $229,000. On May 9, 1926, these totals were $282,000. On June 26, 1926, they totaled $277,000. New time deposits and renewals of existing time deposits up to May 9, 1926, amounted to $44,000; and up to June 26, 1926, $50,000. Regardless, therefore, of any selection of dates as between May 9 and June 26, 1926, the rate of defendant's assessment could not be less than 100 per cent. The same thing would be true if he should be deemed liable only for debts created or renewed on and after November 27, 1925. We therefore pursue no further this feature of the record.

VI. Other defenses pleaded are not pressed in argument, and we need not consider them.

We are not unmindful of the hardship imposed upon the defendant by the result herein. His adventure in friendship has proved to be a costly one. The result, however, is inevitable under the law. A failing bank means disaster, not only to one, but to

many. It is like a falling structure, which casts its missiles in every direction. The defendant generously exposed himself to the attendant danger of this failing institution. The measure of his generosity was the measure of the risk which he assumed. In the emergency, he could not help his friends without risk to himself. The danger was doubtless greater than he supposed. This possibility inheres in every assumption of a risk. Since he voluntarily assumed it, the court has no legitimate power to relieve him from it.

The judgment of the district court is, accordingly,—*Affirmed*.

FAVILLE, C. J., and STEVENS, DE GRAFF, MORLING, KINDIG, WAGNER, and GRIMM, JJ., concur.